48 P.3d 1202

**STATE of Arizona, Appellant,**

v.

**David Rodney SCHAFFER, Appellee.**

**No. 1 CA–CR 01–0453.**

Court of Appeals of Arizona,
Division 1, Department E.

June 27, 2002.

Richard M. Romley, Maricopa County Attorney by Gerald R. Grant, Deputy County Attorney, Phoenix, Attorneys for Appellant.

Maricopa County Public Defender by Louise Stark, Deputy Public Defender, Phoenix, Attorneys for Appellee.

## OPINION

NOYES, Presiding Judge.

¶ 1 The State appeals the dismissal of an aggravated assault charge against David Rodney Schaffer ("Defendant"). Because we conclude that a prosthetic device can be a "dangerous instrument" within the meaning of the aggravated assault statute, *see* Arizona Revised Statutes ("A.R.S.") section 13–1204(A)(2) (Supp.2001),[1] we reverse the dismissal and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 A grand jury indicted Defendant on two counts of aggravated assault. Count One charged that Defendant, while "using a prosthetic arm, a deadly weapon or danger-

---

1. Section 13–1204(A)(2) provides that "[a] person commits aggravated assault if the person commits assault" through the use of "a deadly weapon or dangerous instrument."

ous instrument, intentionally, knowingly or recklessly caused a physical injury to [the victim], in violation of A.R.S. §§ 13–1204(A)(2), (B), 13–1203(A)(1), 13–701, 13–702, and 13–801." Count Two charged that Defendant assaulted the same victim while "knowing or having reason to know that the victim was a person summoned or directed by a licensed health care practitioner engaged in his professional duties."

¶3 On the first scheduled day of trial, Defendant filed a "Motion to Dismiss State's Allegation of Dangerous[ness]." Citing *State v. Gordon,* 161 Ariz. 308, 778 P.2d 1204 (1989), Defendant argued that his prosthetic arm[2] could not be a "dangerous instrument" or "deadly weapon."[3] After hearing arguments from defense counsel and the prosecutor, the trial court dismissed Count One of the indictment, and the case went to trial on Count Two.

¶4 The State presented testimony from two security officers at the Arizona State Hospital. The officers had been called to Appellant's room because staff wanted him to move to another room, and he was refusing. When the officers approached Appellant, he became agitated and put his prosthetic arm behind his back. The victim asked Appellant if he was going to use that arm as a weapon. Appellant said, "Only if I have to." Shortly thereafter, Appellant raised his prosthetic arm and swung it at the officer. The prosthesis hit the officer on the head and gave him an abrasion.

¶5 At the conclusion of the State's case, the court granted Defendant's motion for judgment of acquittal on Count Two, on grounds that the State failed to prove that the victim had been "summoned or directed by a licensed health care practitioner." The State then appealed the dismissal of Count One.[4]

¶6 We have jurisdiction to consider the State's appeal, pursuant to the Arizona Constitution, Article 6, Section 9, and A.R.S. §§ 12–120.21(A)(1) (1992), 13–4031 (2001), and 13–4032(1) (2001).

## DISCUSSION

¶7 The State contends that a prosthetic arm is not a "body part" because the arm "is not an amalgamation of flesh, blood, bone and muscle," but is, instead, a mechanical device that, although attached to the body, may qualify as a "dangerous instrument" under the aggravated assault statute.[5]

---

2. Defense counsel described the arm as follows in his opening statement at trial:
This is an older, very much more [ ] rudimentary prosthesis than what you see today.... It's attached via several straps, ... which somewhat work as a harness to his shoulder. It's not permanently affixed. And it does not allow him to come to a straight position like a normal, natural arm. It has a permanent bend in it. At the end of this prosthesis there's a device which is used to approximate the actions of a hand. It's a metal portion which allows the individual to open and close it to pick up items.

3. In *Gordon,* the Arizona Supreme Court held that a person's fists are not "dangerous instruments" for purposes of enhancing a felony conviction under A.R.S. § 13–604.02 (2001). *Id.* at 311, 778 P.2d at 1207.

4. The State argues only that a prosthesis may be a "dangerous instrument," and does not challenge the trial court's conclusion that a prosthesis is not a "deadly weapon." Therefore, we consider only the question whether a prosthesis may qualify as a "dangerous instrument." We note, however, that a "deadly weapon" is "anything designed for lethal use," including a firearm. A.R.S. § 13–105(13) (2001). A "prosthe-

---

sis" is commonly defined as "an artificial device to replace a missing part of the body." Merriam–Webster's Collegiate Dictionary 937 (10th ed.1999); *see also* The Random House Dictionary of the English Language 1553 (2d ed.1987) (defining a "prosthesis" as "a device ... that substitutes for or supplements a missing or defective part of the body"). Thus, the usual prosthesis, by definition, is not "designed for lethal use," but is designed as a substitute body part.

5. Although the State's arguments on appeal are more detailed than those presented to the trial court, we find that the State adequately raised and preserved them, particularly given the fact that Defendant's motion to dismiss was filed on the day of trial, leaving the State no time to prepare a written response and not much time to prepare to argue the matter. Moreover, in interpreting statutes, we will not be limited by the arguments made in the trial court if that would cause us to reach an incorrect result. *Am. Family Mut. Ins. Co. v. Cont'l Cas. Co.,* 200 Ariz. 119, 122 n. 1, ¶16, 23 P.3d 664, 667 n. 1 (App.2001); *cf. State v. Wilson,* 200 Ariz. 390, 393, ¶4, 26 P.3d 1161, 1164 (App.2001) (stating that we review the trial court's interpretation and application of statutes *de novo* ). Because the interpretation of the aggravated assault statute was

¶ 8 Defendant contends that the prosthetic arm *is* his arm, that it remained attached to his body throughout the alleged assault (as opposed to being removed and swung like a club, for example), and that it is therefore a "body part" (just as the defendant's fists were in *Gordon* ) even though it is made of plastic and metal components rather than flesh and bone. Additionally, he asserts that construing the statute to allow a prosthetic device to be a dangerous instrument would violate his right to equal protection of the laws because the law would apply differently to persons with disabilities than to persons without disabilities.

*I. Statutory Analysis*

■ ¶ 9 The statutory definition of a "dangerous instrument" is

anything that under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury.

A.R.S. § 13–105(11). "[I]f an instrument is not inherently dangerous as a matter of law, like a gun or knife, the jury can determine whether the defendant used the object in such a way that it became a 'deadly weapon' " or a dangerous instrument. *Gordon,* 161 Ariz. at 310, 778 P.2d at 1206 (citing *State v. Bustamonte,* 122 Ariz. 105, 107, 593 P.2d 659, 661 (1979)).

¶ 10 In *Gordon,* our supreme court considered whether a defendant who "used no object in perpetrating the crime, only his fists—part of his body," could be found to have used a "dangerous instrument" for purposes of a sentence enhancement statute, A.R.S. § 13–604.02. *Id.* The court analyzed the statute's words and the legislative intent behind the statute, and effectively provided three reasons why "body parts" such as fists cannot be "dangerous instruments" within the meaning of the enhancement statute. *Id.* at 310–11, 778 P.2d at 1206–07.

¶ 11 First, the court noted that the enhancement statute at issue specifically allows "enhanced punishment when the defendant assaults with a dangerous instrument *or*

when he causes serious injury." *Id.* at 311, 778 P.2d at 1207 (citing A.R.S. § 13–604.02). Because punishment may be enhanced if a defendant actually causes serious injury, "no purpose exists for allowing the jury to find that body parts are dangerous instruments just because they caused serious bodily harm." *Id.* Thus, the dangerous instrument enhancement portion may apply only if no serious physical injury occurs. The court further explained that "allowing the jury to find fists a dangerous instrument without serious physical injury creates an undefined standard—a 'not so serious physical injury' enhancement test." *Id.* Thus, juries would struggle, with no standards to guide them, to decide whether a fist, which did not actually cause serious physical injury, is a "dangerous instrument" capable of causing serious injury. *See id.*

¶ 12 Second, the court explained that "one cannot commit an assault without using, or threatening to use, an object or body part." *Id.* Thus, "if bare hands are a weapon, every assault would be an aggravated assault and the legislature could not have intended to merge the two offenses." *Id.* (citing *People v. Van Diver,* 80 Mich.App. 352, 263 N.W.2d 370 (1977)).

¶ 13 Third, the court considered the "deterrent objective" of the enhancement statute, noting that the "legislature specifically intended that courts treat paroled felons who commit offenses with dangerous instruments or cause serious physical injury more harshly than paroled felons who do neither." *Id.* If the punishment is the same for felons who do not use dangerous instruments, "then felons might as well use a dangerous instrument." *Id.* The court declined to undermine the legislature's distinction between the two types of offenses. *See id.*

■ ¶ 14 Although the issue in this case involves the type of offense charged (assault versus aggravated assault) rather than a sentence enhancement imposed after conviction, the same considerations are relevant to the analysis. The legislature has carefully dis-

placed at issue in the trial court, we consider all arguments raised by the parties on appeal related to the proper interpretation of the statute.

tinguished between persons who assault others and those who assault others while using a "dangerous instrument," and we must ensure that the distinctions between the crimes are not blurred. Nevertheless, finding that a prosthetic device may be a "dangerous instrument" does not (1) create an unworkable standard, (2) merge the crimes of aggravated assault and assault, or (3) obviate the deterrent objectives of the aggravated assault statute.

¶ 15 First, unlike the use of a fist or other body part made of flesh and bone, the use of a prosthesis can readily be analyzed for appropriate factors, other than the severity of the resulting injury, to determine when its characteristics or manner of use make it a "dangerous instrument" that is capable of causing serious physical injury, even when such injury has not been caused. For example, some prostheses may be made of metal or may have jagged parts or hooks protruding from them; others may be made of softer latex or plastic materials, with a smooth finish, making them inherently less likely to injure another person. Additionally, if a defendant uses or threatens to use the prosthesis in a way that a fist or other naturally grown body part could not be used, the jury may consider whether that use (or threatened use) enhanced its dangerousness. In short, a prosthesis is not a "body part," but is a device designed to be used as a substitute for a missing body part. The characteristics of the device itself, coupled with the manner in which it is actually used, are sufficient to allow the jury to determine whether it qualifies as a "dangerous instrument," regardless of the severity of the resulting injury.

¶ 16 Second, allowing the jury to consider whether Defendant's prosthesis is a "dangerous instrument" would not confuse the essential elements of assault and aggravated assault. In general, a defendant may commit an assault either with or without the use of an object (whether the object be a rock, gun, knife, or something else). Similarly, in this case, Defendant could have committed an assault without using, or threatening to use, his prosthetic arm, either by removing it or simply by using his other arm instead.

¶ 17 Additionally, in evaluating whether an item is a "dangerous instrument," a jury must consider the "circumstances in which it is used." A.R.S. § 13–105(11). Thus, a jury must consider the way in which Defendant's prosthetic arm was used. The jury might well find that Defendant did no more than struggle with the victim, using his prosthetic arm in the same way any other person might use an arm or hand. Alternatively, the jury might conclude that Defendant, well-aware of the device's potential to injure, attempted to use it in a manner calculated to cause more injury than a flesh-and-bone body part could have caused. In short, because prosthetic devices may differ significantly in their characteristics and may be used in a variety of ways, both similar and dissimilar to the way that body parts are used, allowing the jury to determine whether a prosthesis is a "dangerous instrument" does not confuse the essential elements of assault and aggravated assault.

¶ 18 Third, both the statute analyzed in *Gordon* (A.R.S. § 13–604.02) and the aggravated assault statute (A.R.S. § 13–1204) have a "deterrent objective"—to treat those "who commit offenses with dangerous instruments . . . more harshly than [those] who do [not]." *Gordon*, 161 Ariz. at 311, 778 P.2d at 1207. Because, "under the circumstances in which it is used," a prosthetic device may be more likely to cause injury than a flesh-and-bone body part, allowing the jury to decide whether that device is a "dangerous instrument" furthers the legislative intent of the statute.

¶ 19 Thus, we conclude that although a prosthetic device is designed to be used as a substitute for a body part, such a device is not a "body part" within the meaning of *Gordon*. Therefore, the State properly brought the aggravated assault charge under A.R.S. § 13–1204(A)(2).

## II. Equal Protection

¶ 20 Defendant next contends that interpreting the aggravated assault statute to allow for aggravation based on the use of his prosthetic arm as a "dangerous instrument" violates his right to equal protection of the laws under the United States and Arizona

Constitutions, as well as under the Americans with Disabilities Act of 1990. *See* U.S. Const. amends. V, XIV; Ariz. Const. art. 2, §§ 4, 13; 42 U.S.C. § 12112 (1994). He argues that "persons with prostheses" are a "suspect class" for purposes of equal protection, thus requiring heightened scrutiny of the allegedly discriminatory statute. He asserts that the aggravated assault statute, under the interpretation argued by the State, is discriminatory because it punishes disabled persons with prostheses more harshly than persons without prostheses for committing the same act.

¶ 21 We first note that the aggravated assault statute at issue does not on its face "classify" persons at all; it classifies actions taken by persons. *See* A.R.S. § 13–1204(A)(2) ("A person commits aggravated assault if the person commits assault ... under any of the following circumstances: ... (2) If the person uses a deadly weapon or dangerous instrument."). Thus, the "dangerous instrument" charge does not apply only to persons who wear prostheses. Rather, the statute applies equally to all persons, whether they wear prostheses or not, who use anything other than a body part to commit an assault. A person who wears a prosthetic body part may commit an assault without using it, and a person who does not wear a prosthetic body part could use one in committing an assault. Because all persons—whether disabled or not—who commit aggravated assault using a prosthetic device are subject to the same penalty, the legislation does not classify persons based on their disability.

¶ 22 Defendant argues, however, that persons who assault someone using a prosthetic body part are subject to a harsher penalty than persons who assault someone in the same manner while using a corresponding non-prosthetic body part. Thus, he contends, the statute as applied unfairly discriminates against persons who wear prostheses, and consequently, the statute should be subject to a heightened level of scrutiny under equal protection analysis. We find this argument to be meritless.

¶ 23 Even if we assume *arguendo* that the statute affects persons with prostheses differently than persons without prostheses, Defendant cites no cases or other authority to support his claim that "persons with prostheses" are a suspect class, therefore requiring heightened scrutiny of the statute under the equal protection clause. Generally, suspect classes include those based on race, national origin, or religion (requiring strict scrutiny of the statute) or gender or illegitimacy of birth (requiring an intermediate level of scrutiny of the statute). *See Kenyon v. Hammer*, 142 Ariz. 69, 78–79, 688 P.2d 961, 970–71 (1984); *Kahn v. Thompson*, 185 Ariz. 408, 413, 916 P.2d 1124, 1129 (App.1995). Because "persons with prostheses" do not fall into any of these suspect classes, the statute must be examined only under the "rational basis" test (the lowest level of scrutiny). *See Kenyon*, 142 Ariz. at 78, 688 P.2d at 970; *see also Schuff Steel Co. v. Indus. Comm'n*, 181 Ariz. 435, 443, 891 P.2d 902, 910 (App.1994) (noting that the Supreme Court has applied the rational basis test to classifications based on disability) (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 445–46, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)).

¶ 24 Under the rational basis test, legislation that imposes burdens on one class but not another will be upheld if (1) the legislation serves a "legitimate state interest" and (2) the "classification rationally furthers the state's legitimate interest." *Kenyon*, 142 Ariz. at 78, 688 P.2d at 970. Here, the aggravated assault statute serves a legitimate state interest in preventing serious injuries to persons by deterring the use of dangerous objects during the commission of assaults. Additionally, any extra burden the statute imposes on persons wearing prostheses is rationally related to this legitimate state interest. To the extent that such prostheses are found to be "dangerous instruments" due to their physical characteristics combined with the circumstances under which they are used, *see* A.R.S. § 13–105(11), the State has a legitimate interest in deterring such use, and enhanced punishment is a rational method of deterrence.

¶ 25 We conclude that charging Defendant with the use of a "dangerous instrument" under the aggravated assault statute does not violate his right to equal protection of the laws. The issue whether Defendant's prosthetic arm was a "dangerous instrument" is a jury question. We therefore reverse the trial court's dismissal of the charge in Count One of the indictment, and we remand for further proceedings.

CONCURRING: MICHAEL D. RYAN, Judge, and CECIL B. PATTERSON, JR., Judge.