265 P.3d 389

MARIO W., Petitioner,

v.

The Honorable Thomas KAIPIO, Commissioner of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Commissioner,

State of Arizona, Real Party in Interest.

Bradley W., Petitioner,

v.

The Honorable Thomas Kaipio, Commissioner of the Superior Court of the State of Arizona, In and for the County of Maricopa, Respondent Commissioner,

State of Arizona, Real Party in Interest.

Alexis A., Petitioner,

v.

The Honorable Mark Brain, Commissioner of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Commissioner,

The State of Arizona, Real
Party in Interest.

Noble B., Petitioner,

v.

The Honorable Thomas Kaipio, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,

State of Arizona, Real Party in Interest.

Bailey J., Petitioner,

v.

The Honorable Mark F. Aceto, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,

State of Arizona, Real Party in Interest.

Devon C., Petitioner,

v.

The Honorable Peter A. Thompson, Commissioner of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Commissioner,

State of Arizona, Real Party in Interest.

Eric R., Petitioner,

v.

The Honorable Kaipio, Commissioner Of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,

State of Arizona Real Party
in Interest, Respondent.

Nos. 1 CA–SA 11–0016, 1 CA–SA 11–0020, 1 CA–SA 11–0025, 1 CA–SA 11–0031, 1 CA–SA 11–0032, 1 CA–SA 11–0042, 1 CA–SA 11–0043.

Court of Appeals of Arizona,
Division 1, Department D.

Oct. 27, 2011.

Maricopa County Public Defender's Office By Aaron Jason Max, Deputy Public Defender, Thomas R. Garrison, Deputy Public Defender, Lori A. Markle, Deputy Juvenile Public Defender, Phoenix, Attorneys for Petitioner Mario W.

Maricopa County Public Defender's Office By Ian Pettycrew, Deputy Juvenile Public Advocate, Mesa, Attorneys for Bradley W.

Maricopa County Public Defender's Office By Lori A. Markle, Deputy Juvenile Public Defender, Phoenix, Attorneys for Petitioner Alexis A.

Maricopa County Public Defender's Office By Colleen Engineer, Deputy Juvenile Public Defender, Mesa, Attorneys for Petitioner Noble B. and Devon C.

Maricopa County Public Defender's Office By Vincent Troiano, Deputy Juvenile Public Defender, Mesa, Attorneys for Petitioner Baily J.

Maricopa County Public Defender's Office By Devra N. Ellexson, Deputy Juvenile Public Defender, Mesa, Attorneys for Petitioner Eric R.

Maricopa County Attorney's Office By Linda Van Brakel, Deputy County Attorney, David J. Flader, Deputy County Attorney, Jeffrey W. Trudgian, Deputy County Attorney, Phoenix, Attorneys for Real Party In Interest.

## OPINION

GEMMILL, Judge.

¶ 1 These consolidated special actions require us to evaluate the constitutionality of the requirement under Arizona Revised Statutes ("A.R.S.") section 8–238 (Supp. 2009) that the seven juvenile petitioners submit a tissue sample for deoxyribonucleic acid ("DNA") testing as a condition of their release.[1] For the reasons that follow, we decide that the taking of DNA samples from five of the juveniles (Mario, Bradley, Alexis, Eric, and Noble) (hereinafter "five juveniles") is constitutional but that the proposed taking of DNA samples from two of the juveniles (Bailey and Devon) ("two juveniles") would be unconstitutional in the absence of a judicial finding of probable cause to believe the juvenile committed one of the offenses listed in A.R.S. § 8–238.

¶ 2 Regarding the five juveniles, Judge Orozco and I agree that the DNA sample may constitutionally be taken, although our reasoning differs to some extent, and Judge Norris dissents from our decision regarding these five juveniles. Regarding the two juveniles, Judge Norris and I agree that application of A.R.S. § 8–238 to take DNA samples from these two juveniles would be unconstitutional, although our reasoning differs significantly. Judge Orozco concludes that the operation of applicable statutes and juvenile court rules will, as a practical matter, prevent the taking of DNA samples from these two juveniles in the absence of a judicial finding of probable cause, and she therefore disagrees with our conclusion regarding the two juveniles.

¶ 3 For the reasons that follow in my portion of this opinion, I conclude that DNA samples may constitutionally be taken from the five juveniles primarily because there has been a judicial finding of probable cause to believe that each juvenile has committed one of the enumerated offenses within A.R.S. § 8–238. For the two juveniles, there has been no such finding, and I conclude that the constitutional protection against unreasonable searches and seizures precludes the taking of the DNA samples under these circumstances.

¶ 4 For the reasons stated in Judge Orozco's separate concurrence and dissent, she concludes that the statutorily authorized use of the DNA information for identification is substantively similar to the common use of fingerprints and that A.R.S. § 8–238 is constitutionally applied to all seven juveniles because a finding of probable cause will necessarily be made regarding the two juveniles before they can be detained.

¶ 5 For the reasons stated in Judge Norris's separate dissent and concurrence, she concludes that under most circumstances the pre-adjudication taking of DNA from juveniles accused of the offenses listed in A.R.S. § 8–238 is unconstitutional even if there has been a judicial finding of probable cause to

---

1. Section 8–238 provides:
 A. If a juvenile is arrested for a violation of any of the following offenses and is summoned to appear at an advisory hearing, the judicial officer shall order the juvenile to report within five days to the law enforcement agency that arrested the juvenile or to the agency's designee and submit a sufficient sample of buccal cells or other bodily substances for deoxyribonucleic acid testing and extraction:
 1. An offense listed in title 13, chapter 11.

2. A violation of § 13–1402, 13–1403, 13–1404, 13–1405, 13–1406, 13–1410, 13–1411 or 13–1417.
 3. A violation of § 13–1507 or 13–1508.
 4. A violation of any serious offense as defined in § 13–706 that is a dangerous offense as defined in § 13–105.
 B. If a juvenile does not comply with an order issued pursuant to subsection A of this section, the court shall revoke the juvenile's release.

believe that the juvenile has committed one of the listed offenses.

## JURISDICTION

¶ 6 Special action jurisdiction is appropriate when there is no "equally plain, speedy, and adequate remedy by appeal." Ariz. R. Spec. Act. 1(a); *State ex rel. Pennartz v. Olcavage*, 200 Ariz. 582, 585, ¶ 8, 30 P.3d 649, 652 (App.2001). "Special action jurisdiction is more likely to be accepted in cases involving a matter of first impression, statewide significance, or pure questions of law." *State ex rel. Pennartz*, 200 Ariz. at 585, ¶ 8, 30 P.3d at 652. This case involves the interpretation of a statute, A.R.S. § 8–238,[2] as a matter of first impression, and presents both a pure question of law and a matter of statewide importance. Accordingly, in our discretion we will exercise our special action jurisdiction in these consolidated matters.

## BACKGROUND

¶ 7 Seven juveniles, Mario, Bradley, Alexis, Eric, Noble, Bailey, and Devon, petition for special action relief regarding the necessity of their compliance with the statutory requirement to submit to a DNA sample prior to their release.

¶ 8 Mario, age fourteen years, was the subject of a juvenile referral alleging that he committed sexual conduct with a minor. A petition for delinquency was subsequently filed, charging him with one count of sexual conduct with a minor, in violation of A.R.S. § 13–1405 (2010). At an advisory hearing, the court found that there was probable cause to believe Mario committed the offense with which he was charged. The court ordered that the juvenile submit to DNA testing within five days of the hearing as a condition of his release. Counsel for Mario requested a stay of the order for DNA testing, which the court denied. Mario was released to a family member on the Juvenile

Electronic Tracking System ("JETS"), and the court ordered him to have a DPS ankle bracelet and refrain from contact with the victim. The court also ordered that Mario participate in the mental competency process. The court advised Mario that, if he did not provide the DNA sample, the prosecutor could move to revoke his release, and he could be brought back into detention for failing to comply with the statute.

¶ 9 Thirteen-year-old Bradley was also the subject of a juvenile referral for allegedly committing sexual conduct with a minor. The State filed a petition for delinquency and charged Bradley with count one, attempted sexual conduct with a minor under fifteen, in violation of A.R.S. § 13–1405, and, count two, assault with intent to injure, insult, or provoke, in violation of A.R.S. § 13–1203(A)(3) (2010). At an advisory hearing, the court found that there was probable cause that Bradley committed the charged offenses. The court released Bradley to the care of a family member, and the court ordered that Bradley undergo a mental competency evaluation, refrain from contact with the victim, be released with an ankle bracelet, and submit a DNA sample within five days.

¶ 10 Fifteen-year-old Alexis was the subject of a juvenile referral alleging that he committed burglary in the second degree. The State subsequently filed a delinquency petition charging Alexis with count one, burglary in the second degree, in violation of A.R.S. § 13–1507 (2010), and, count two, possession of burglary tools, in violation of A.R.S. § 13–1505 (2010). At a pretrial conference, the juvenile court noted that the court had neglected to order that Alexis provide a DNA sample within five days following his advisory hearing. Counsel for Alexis requested that the court order a stay regarding the DNA sample because A.R.S. § 8–238 was unconstitutional and there had been no finding of probable cause for the taking of the

---

2. Our analysis necessarily focuses on the version of A.R.S. § 8–238 in effect at the time of the alleged offenses. We note, however, that the statute was recently amended. *See* S.B. 1367, 50th Leg., 1st Reg. Sess. (Ariz. 2011). The amendment, which became effective in July 2011, (1) expanded the DNA sample requirement of § 8–238(A) to apply to juveniles who have

been charged with, rather than arrested for, certain offenses; (2) mandated that the investigating law enforcement agency, or its designee, transmit the DNA sample to the Arizona Department of Public Safety ("DPS"); and (3) designated that the use, maintenance, and expungement provisions of A.R.S. § 13–610 (2010) apply to all DNA samples taken pursuant to § 8–238. *Id.*

DNA. The court recognized that there had been two previous judicial findings of probable cause that Alexis committed the offenses with which he was charged. In denying the stay request, the court concluded that the taking of the DNA sample was "like taking photos of someone ... [or] taking fingerprints of them." The court released Alexis to a family member and ordered that he attend school daily, undergo urinalysis testing as directed, refrain from contact with the victims, and provide a DNA sample within five days. The court advised Alexis that, if Alexis did not provide the DNA sample, his release conditions could be revoked.

¶ 11 Thirteen-year-old Eric was the subject of a juvenile referral for burglary in the second degree, destruction of evidence, and domestic violence assault. The State subsequently filed a delinquency petition, charging Eric with one count of burglary in the second degree, a class three felony, in violation of A.R.S. § 13–1507 (2010), and one count of domestic violence disorderly conduct, a class 1 misdemeanor, in violation of A.R.S. § 13–2904 (2010). At an advisory hearing, the court appointed counsel to represent Eric and found that there was probable cause to believe that Eric committed the charged offenses. The court ordered that Eric undergo mandatory DNA testing, but the court stayed the order pending resolution of the special action in this court. The court further ordered that Eric attend school, have no contact with the victims, and be released on an ankle bracelet with an electronic monitoring device.

¶ 12 Twelve-year-old Noble was the subject of a juvenile referral for child molestation and sexual conduct with a minor. The State filed a delinquency petition charging Noble with two counts of sexual conduct with a minor under fifteen, class 2 felonies, in violation of A.R.S. § 13–1405. At an advisory hearing, the court found Noble to be indigent and ordered that he be appointed counsel. The court also found probable cause to believe Noble committed the charged offenses, and the court ordered that Noble be released to a family member. The court further ordered that Noble attend school, have no contact with the victims, be

released on the JETS program with an ankle bracelet, be prohibited from viewing or accessing any materials for the purpose of sexual arousal, sleep in his own bed, refrain from any unsupervised use of the internet or computer, dress and undress alone, be prohibited from playing any video game with a rating higher than E or viewing any movie with a rating higher than PG, and be prohibited from possessing a cellular phone capable of receiving or sending images or accessing the internet. The court initially ordered that Noble submit to a DNA sample within five days of his release, but later stayed the order pending resolution of this special action.

¶ 13 Bailey, age thirteen years, was the subject of a juvenile referral alleging that he committed two counts of child molestation. A petition for delinquency was subsequently filed, charging with him with two counts of molestation of a child, in violation of A.R.S. § 13–1410 (2010). The court held an advisory hearing, and counsel for Bailey requested a mental competency evaluation. The court initially ordered that Bailey submit a DNA sample, but then the court stayed that part of the order, pending further order of this court. The court also ordered that Bailey be released to his parents, attend school, participate in a mental competency evaluation program, submit to an ankle bracelet, and participate in the JETS program. The court also prohibited Bailey from having any unsupervised contact with children under twelve years of age, and stated that the court would issue a safety plan detailing specific restrictions that Bailey, Bailey's probation officer, and one of Bailey's parents would all have to sign. There is no evidence of a judicial finding of probable cause in the record.

¶ 14 Thirteen-year-old Devon was the subject of a juvenile referral for burglary, theft, and criminal damage. The State subsequently filed a delinquency petition charging Devon with one count of burglary in the second degree, a class three felony, in violation of A.R.S. § 13–1507; one count of criminal damage in an amount of $250 or less, a class 2 misdemeanor, in violation of A.R.S. § 13–1602(A)(1–4), (B)(5) (2010); and two counts of theft, of a value less than $1000, class 1 misdemeanors, in violation of A.R.S.

§ 13–1802 (2010). At an advisory hearing, the court ordered that Devon be appointed counsel to represent him. The court ordered that Devon submit to a DNA sample, and Devon's counsel requested the order be stayed, which the court denied. The court ordered that Devon be released to a family member, and the court further ordered that Devon attend school and have no contact with the victims. There is no evidence of a judicial finding of probable cause in the record.

¶ 15 In conjunction with their petitions for special action, at least six of the juveniles filed motions to stay execution of order pending disposition of petition for special action. This court stayed the juvenile court orders requiring Mario, Bradley, and Alexis to submit DNA samples. The juvenile court stayed its own orders requiring DNA testing of Eric, Bailey, and Noble.

## ANALYSIS

¶ 16 We review the constitutionality of a statute *de novo*. *City of Tucson v. Pima County*, 199 Ariz. 509, 515, ¶ 18, 19 P.3d 650, 656 (App.2001). We presume statutes to be constitutional, unless shown otherwise, and "[w]e will not declare an act of the legislature unconstitutional unless we are satisfied beyond a reasonable doubt that the act is in conflict with the federal or state constitutions." *Chevron Chem. Co. v. Superior Court*, 131 Ariz. 431, 438, 641 P.2d 1275, 1282 (1982). When doubts exist as to a statute's viability, we attempt to construe the statute with "a reasonable and constitutional meaning." *LaFaro v. Cahill*, 203 Ariz. 482, 488, ¶ 21, 56 P.3d 56, 62 (App.2002) (quoting *McGovern v. McGovern*, 201 Ariz. 172, 178, ¶ 20, 33 P.3d 506, 512 (App.2001)).

### *Fourth Amendment Concerns: Unreasonable Search and Privacy*

¶ 17 The juveniles contend that A.R.S. § 8–238 violates federal and Arizona constitutional protections against unreasonable searches and right to privacy. In response, the State argues that the juveniles have a diminished expectation of privacy because of their status as persons arrested for serious delinquent offenses and because arrested persons's liberties may be appropriately restricted. In addition, the State asserts that requiring a juvenile charged with certain offenses to submit to a pre-adjudication DNA sample does not constitute an unreasonable search because it furthers a legitimate governmental purpose and does not violate the juvenile's right to privacy. Although the State argues that a finding of probable cause is not necessary to uphold the constitutionality of the statute, the State also notes that for the five juveniles, there was a judicial finding of probable cause to believe that each committed one of the offenses listed in A.R.S. § 8–238.

¶ 18 Using a buccal swab to procure a DNA sample, like blood drawn for the same purpose, constitutes a search under the Fourth Amendment. *Maricopa County Juvenile Action Nos. JV–512600 and JV–512797*, 187 Ariz. 419, 423, 930 P.2d 496, 500 (App.1997) (recognizing that "a compelled intrusion[ ] into the body for blood" is deemed a Fourth Amendment search (quoting *Schmerber v. State of California*, 384 U.S. 757, 767–68, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966))); *see also State v. Garcia–Salgado*, 170 Wash.2d 176, 240 P.3d 153, 157 (2010) (finding that a cheek swab, taken for the purposes of collecting DNA, constitutes a search under the Fourth Amendment). In general, a search is considered unreasonable unless it is accompanied by a judicial warrant issued following a finding of probable cause. *JV–512600 and JV–512797*, 187 Ariz. at 423, 930 P.2d at 500.

¶ 19 The totality of the circumstances test is used to balance the juveniles's individual rights against the State's interest in conducting the DNA search. *See United States v. Mitchell*, 652 F.3d 387, 390, 399, 403–04 (3d Cir.2011) (applying the totality of the circumstances test to balance the government's rights to conduct a DNA search of an arrestee and pretrial detainee under the federal DNA Act, 42 U.S.C. § 14135a(a) (2006)); *United States v. Conley*, 453 F.3d 674, 680 (6th Cir.2006) (utilizing a totality of circumstances analysis and finding the taking of a DNA sample from a convicted felon to be

constitutional due to the convicted felon's "sharply reduced expectation of privacy, and the minimal intrusion required in taking a blood sample for DNA analysis for identification purposes only"); *see also Samson v. California,* 547 U.S. 843, 846, 848, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006) (applying the totality of circumstances test and finding a state law that required parolees to agree to be subject to a search or seizure by a parole officer at any time, with or without cause, to be constitutional); *U.S. v. Knights,* 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (finding a warrantless search of a probationer's apartment to be constitutional under the Fourth Amendment after examining the totality of circumstances). My colleagues on this panel agree that the totality of the circumstances test is applicable.

¶ 20 We analyze various factors to evaluate the balance of the juveniles's rights against the governmental interest in this case. Such factors include: whether there was a judicial finding of probable cause that the juvenile committed the charged offense, the level of intrusion in relation to other preadjudicative procedures, the degree and nature of physical intrusion required by the test, statutes restricting use of test results, and any evidence in the record regarding improper uses of the results.

¶ 21 DNA samples may be constitutionally taken from defendants who have been convicted of serious offenses because convicted felons have reduced rights of privacy and states have substantial interests in protecting the public by acquiring DNA samples to deter future offenses and solve pending investigations. *See, e.g., In re Leopoldo L.,* 209 Ariz. 249, 254–55, ¶¶ 21–22, 25, 99 P.3d 578, 583–84 (App.2004) (upholding the taking of DNA samples from adjudicated juveniles and concluding that DNA testing assists in identifying persons who have committed or may commit crimes and in deterrence); *Polston v. State,* 360 Ark. 317, 201 S.W.3d 406, 408, 411–414 (2005) (upholding constitutional challenge to state's DNA Act, which permitted taking DNA samples from persons convicted of felonies because state's interest in crime prevention and resolution outweighed defendant's reduced expectation of privacy); *State v. Hutchinson,* 969 A.2d 923, 928–932 (Me.2009), *cert. denied,* — U.S. ——, 130 S.Ct. 510, 175 L.Ed.2d 362 (2009) (upholding constitutionality of state law requiring convicted felons to provide DNA samples based on reduced expectation of privacy, minimal intrusion of buccal swab procedure, statutory safeguards against misuse of DNA information, and state's interest in solving existing crimes, deterring recidivism, and absolving innocent persons); *State v. Sanders,* 343 Or. 35, 163 P.3d 607, 612 (2007) (looking to federal appellate law and concluding that state law requiring convicted felons to submit a blood or buccal swab sample for DNA testing was reasonable under the totality of the circumstances and constitutional under the Fourth Amendment).

¶ 22 A judicial finding of probable cause serves as a "watershed event" that distinguishes such a defendant from the general public and permits application of the totality of circumstances exception to the warrant requirement of the Fourth Amendment. In this regard, I agree with the reasoning of the United States Magistrate Judge in *United States v. Pool,* 645 F.Supp.2d 903 (E.D.Cal.2009): [3]

> The judicial or grand jury finding of probable cause within a criminal proceeding is a watershed event which should be viewed differently from mere pre-judicial involvement gathering of evidence. After such a judicial finding, a defendant's liberty may be greatly restricted-even denied. As part of his pre-trial release, defendant may be deprived of his very liberty; he can be subject to electronic monitoring; he may be ordered to obey a mandatory curfew. Also, the court can order a defendant to refrain from traveling outside of the East-

---

**3.** After a *de novo* review, the United States District Judge adopted the magistrate judge's reasoning regarding the taking of defendant Pool's DNA sample as a condition of his pretrial release. *U.S. v. Pool,* S–09–0015, 2009 WL 2152029 at *1 (E.D.Cal. July 15, 2009). Both the magistrate judge's order and the district judge's order were vacated following a guilty plea by Pool in September 2011. *United States v. Pool,* No. 09–10303, 2011 WL 4359899 at *1 (9th Cir. September 19, 2011).

ern District of California without prior approval, not to possess a firearm and that he must reside at a location that is reviewed and approved by the Pretrial Services Officer. In a pornography case he can be directed to not have any communications with a minor without the child's parent or guardian being present, cannot be found within 100 feet of a schoolyard, park, playground or other place frequented by children, cannot access the internet or possess a computer at his residence without prior approval. These conditions are almost identical to those conditions which can be imposed on a probationer or parolee for whom a DNA testing requirement has been found appropriate under a totality of the circumstances standard. The court finds that an up-front requirement for finding probable cause that the defendant has committed the charged felony places the issue much more closely with those cases utilizing a totality of the circumstances standard.

*Id.* at 909 (footnotes omitted), *vacated upon guilty plea, United States v. Pool,* No. 09–10303, 2011 WL 4359899 at *1.

 ¶ 23 For the five juveniles, there has been a judicial finding of probable cause, either during an advisory hearing or at a pretrial conference, that they had committed the charged offenses. Additionally, numerous routine restrictions are placed on the juveniles at the time of their release from detention. *See supra* ¶¶ 8–14. "The court may release [a] juvenile and set such terms and conditions of release as deemed appropriate." Ariz. R.P. Juv. Ct. 23(E). For example, as a condition of their release, five of the juveniles were required to submit to an ankle bracelet with GPS monitoring through the JETS program. These restrictions, and especially the findings of probable cause, distinguish the five juveniles from the general public. Under the totality of the circumstances, the taking of DNA samples from these juveniles is constitutionally justified.

¶ 24 This conclusion is supported by the five juveniles's reduced expectation of privacy and the State's enhanced interest in crime

prevention and deterrence, based on the judicial finding of probable cause to believe that each juvenile has committed at least one of the offenses listed in A.R.S. § 8–238. *See Pool,* 645 F.Supp.2d at 909–11. Also, the buccal swab procedure specified in § 8–238 constitutes a minimal physical intrusion. *See State v. O'Hagen,* 189 N.J. 140, 914 A.2d 267, 280 (2007) ("[T]he taking of a buccal cheek swab is a very minor physical intrusion upon the person. . . . [It] is no more intrusive than the fingerprint procedure and the taking of one's photograph that a person must already undergo as part of the normal arrest process.").

¶ 25 Juveniles contend that DNA can disclose their entire genetic code, which could reveal such information as paternity or familial relationship, medical conditions, and other private information. Arizona law, however, strictly limits the use of the DNA information to the following:

1. For law enforcement identification purposes.

2. In a proceeding in a criminal prosecution or juvenile adjudication.

3. In a proceeding under title 36, chapter 37 [relating to sexually violent persons].

A.R.S. § 13–610(I). Because the use of the DNA information is limited by statute and because there is no evidence in this record to show that their DNA samples will be misused, I do not find the juveniles's concerns about possible misuse to be persuasive. We have no evidence before us demonstrating that any DNA samples taken in the past have been used in any way contrary to the applicable statutory limitations.

 ¶ 26 Juveniles also contend that DNA samples are stored for future testing and therefore samples have "a continuing role which can be utilized in ways the juvenile can never control." Although samples may be stored for future use, statutory provisions permit the expungement of the DNA sample if the juvenile is later found to be acquitted of the charged crimes. A.R.S. § 13–610(M).[4] The juveniles further argue

4. Pursuant to A.R.S. § 13–610(M):

A person . . . may petition the superior court in the county in which the arrest occurred or the

that neither the statute nor Rule 23(G) of the Arizona Rules of Procedure for the Juvenile Court "requires a warrant or any other showing of individualized suspicion to support the order that the minor succumb to this compelled search and seizure." *See* Ariz. R.P. Juv. Crt. 23(G) (permitting the juvenile probation officer or prosecution to "file a written request with the court to revoke the juvenile's release if there is probable cause to believe a DNA sample was not provided in accordance with A.R.S. § 8–238). A judicial finding of probable cause that the juvenile committed the crime for which he or she is charged, however, is sufficient to constitutionally support the taking of a DNA sample. The "Fourth Amendment does not require an additional finding of individualized suspicion" for the taking of a DNA sample. *Jones v. Murray*, 962 F.2d 302, 306–07 (4th Cir.1992).

¶ 27 The juveniles also argue that the DNA testing violates their right to privacy guaranteed under the Fourth and Fourteenth Amendments to the U.S. Constitution and Article 2, Section 8, of the Arizona Constitution. We have previously found that "[a]lthough the physical intrusion involved in drawing blood infringes upon an individual's expectation of privacy, the intrusion is reasonable in light of the need to ensure public safety." *JV–512600 and JV–512797*, 187 Ariz. at 423, 930 P.2d at 500 (upholding the constitutionality of A.R.S. §§ 13–4438 and 31–281, which compelled the taking of DNA samples of juveniles adjudicated delinquent of a sexual offense).[5] Before a pre-adjudicated juvenile is released into the general public, the government has a strong interest in determining whether the juvenile has a past criminal history. The DNA samples of arrestees aids the government in solving past unsolved crimes. *See Mitchell*, 652 F.3d at 414–15 ("Collecting DNA samples from arrestees can speed both the investigation of

the crime of arrest and the solution of any past crime for which there is a match."). DNA samples may be taken of adjudicated juveniles, and the collection of DNA samples from pre-adjudicated juveniles expands the database of available DNA, by which more crimes may be solved. *See* A.R.S. § 13–610(E) ("Within thirty days after a juvenile is committed to the department of juvenile corrections, the department of juvenile corrections shall secure a sufficient sample of blood or other bodily substances for deoxyribonucleic acid testing and extraction from the youth if the youth was adjudicated delinquent for an offense listed in this section and was committed to a secure care facility."); *see also JV–512600 and JV–512797*, 187 Ariz. at 421, 930 P.2d at 498. This is especially true for juveniles accused of offenses listed in A.R.S. § 8–238, because sex offenses may be difficult to solve without matched DNA evidence. *See id.* at 424, 930 P.2d at 501 ("The public's interest in effective law enforcement, crime prevention, and the identification and apprehension of those who commit sex offenses rightfully outweighs the intrusion on the delinquent juvenile's privacy."). Furthermore, there will often be a time period, even if short, between the release of the juvenile and the juvenile's trial. The government has a substantial interest in solving any new crimes that may be committed, both during this time period and, if the juvenile is convicted, in the future. The taking of DNA samples may also deter juveniles from committing crimes while on pretrial release as well as after adjudication and any applicable detention. *Cf. United States v. Sczubelek*, 402 F.3d 175 (3d Cir.2005) (concluding that the taking of a DNA sample of a convicted felon on supervised release, under the federal DNA Act, was not unreasonable under the Fourth Amendment, in part because "individuals on supervised release are associated with higher recidivism rates [and the] collec-

criminal charge was filed to order that the person's deoxyribonucleic acid profile and sample be expunged from the Arizona deoxyribonucleic acid identification system ... if any of the following applies: 1. The criminal charges are not filed within the applicable period prescribed by § 13–107. 2. The criminal charges are dismissed. 3. The person is acquitted at trial.

5. The statutes upheld in *JV–512600 and JV–512797*, A.R.S. §§ 13–4438 and 31–281, have since been renumbered and repealed, respectively. A.R.S. § 13–4438 was renumbered as A.R.S. § 13–610, Ariz. Sess. Laws, Ch. 226, § 2 (2d Reg. Sess. 2002), and A.R.S. § 31–281 was repealed in 2002. Ariz. Sess. Laws, Ch. 107, § 3 (2d Reg. Sess. 2002).

tion of identifying information will indirectly promote the rehabilitation of criminal offenders by deterring them from committing crimes in the future") (citations omitted).

¶ 28 Additionally, there exists a legitimate governmental interest in obtaining identification from arrested persons. *See Jones*, 962 F.2d at 306 ("[W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it."). Although the juveniles allege that such identification can be achieved through fingerprints, DNA is a more precise method of identification than fingerprinting. *See Sczubelek*, 402 F.3d at 185–86 ("The governmental justification for [DNA testing] ... relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods.").

¶ 29 In a recent challenge to the federal DNA Act, the Third Circuit Court of Appeals found that, under the Act, DNA collection was reasonable and did not violate the Fourth Amendment because "arrestees have a diminished expectation of privacy in their identities." *Mitchell*, 652 F.3d at 390; *see* 42 U.S.C. § 14135(a)(1)(A) (permitting the taking of DNA samples from "individuals who are arrested, facing charges, or convicted."). The court found DNA profiling was akin to fingerprinting and a more precise method of identifying arrestees. *Mitchell*, 652 F.3d at 413. The court concluded that:

> [i]n light of [a] probable cause finding, arrestees possess a diminished expectation of privacy in their own identity, which has traditionally justified taking their fingerprints and photographs. Likewise, because DNA profiles developed pursuant to the DNA Act function as "genetic fingerprints" used only for identification purposes, arrestees and pretrial detainees have reduced privacy interests in the information derived from a DNA sample.

*Id.* at 412.

¶ 30 In sum, the finding of probable cause to believe that a juvenile has committed one of the offenses included in § 8–238 is a significant event that separates the juvenile

from the general population and results in a reduced expectation of privacy. Because there has been a judicial finding of probable cause for these five juveniles, the government's interest in identifying these juveniles outweighs their right to privacy. The taking via buccal swab of tissue samples for DNA testing from the five juveniles is neither an unreasonable search under the Fourth Amendment nor a violation of the juveniles's right to privacy.

### Equal Protection

¶ 31 The federal and state constitutions provide for equal protection for those who are similarly situated. *See* U.S. Const. amend. XIV; Ariz. Const. art. 2, § 13; *see also Martin v. Reinstein*, 195 Ariz. 293, 309, ¶ 49, 987 P.2d 779, 795 (App.1999). The juveniles argue that A.R.S. § 8–238 violates their right to equal protection under the state and federal constitutions because it includes juveniles accused of second-degree burglary, which involves no violence to a person, but excludes other serious felonies, such as kidnapping, arson of an occupied dwelling, and aggravated robbery.

¶ 32 The State argues that § 8–238 promotes two State interests. First, the DNA samples provide the State with necessary information to help identify juveniles arrested for certain crimes. Second, the statute allows the samples to be used for identification in other, unrelated, criminal proceedings.

¶ 33 We apply the rational basis test because § 8–238 does not affect a suspect class. *State v. Schaffer*, 202 Ariz. 592, 597, ¶ 23, 48 P.3d 1202, 1207 (App.2002) (examining a statute under the rational basis test because "persons with prostheses" did not fall into a suspect class). Legislation that imposes burdens on one class but not another will be upheld under the rational basis test if the classification is rationally related to a legitimate state interest. *Id.* at ¶ 24. We also determine whether the statute treats similarly situated persons equally. *Martin*, 195 Ariz. at 309–10, ¶¶ 50, 53, 987 P.2d at 795–96. "We will not substitute our judgment for that of the legislature as to where precisely appropriate lines should be drawn

to determine who should be subject to the [statute]." *Id.* at 312, ¶ 61, 987 P.2d at 798.

¶ 34 In *Martin*, this court rejected an argument that the Sexually Violent Persons Act was too narrowly drawn because it did not apply to all sexually violent persons. *Id.* at 312, ¶¶ 59, 61, 987 P.2d at 798. The Act permitted the state to confine persons found guilty of violent sexual acts, or persons charged with committing such crimes but found incompetent to stand trial, only if the person suffered from a mental disorder that made them more likely to engage in sexual acts. *Id.* at 299, ¶ 2, 987 P.2d at 785. Petitioners argued that the statute did not cover persons serving long terms in prison, those already released from prison, or those persons whom the state chose not to prosecute. *Id.* at 312, ¶ 59, 987 P.2d at 798. Citing *Minnesota ex rel. Pearson v. Probate Court*, 309 U.S. 270, 274–75, 60 S.Ct. 523, 84 L.Ed. 744 (1940), this court noted that such an "all or nothing" argument had been rejected by the U.S. Supreme Court. *Id.* at ¶¶ 60–61; *see also City of Tucson v. Wolfe*, 185 Ariz. 563, 565, 917 P.2d 706, 708 (App.1995) ("The relevant inquiry ... is not whether the statute is drawn as precisely as it might have been, but whether the line chosen by the [legislative body] is within constitutional limitations." (quoting *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 465, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981))). This court concluded that merely because "the Act does not extend to every person who might be [a sexually violent person] does not remove every rational basis for its existence." *Martin*, 195 Ariz. at 312, ¶ 61, 987 P.2d at 798.

¶ 35 "A person commits burglary in the second degree by entering or remaining unlawfully in or on a residential structure with the intent to commit any theft or any felony therein." A.R.S. § 13–1507. There is a rational basis for the inclusion of second degree burglary in the crimes listed due to the physical nature of the crime.

¶ 36 For example, a DNA sample could assist law enforcement in identifying repeat burglars who have left physical evidence at a crime scene. Further, along with the sexual misconduct violations included within A.R.S. § 8–238, the legislature may have been concerned with the risk of harm to individuals residing in a residential structure during the time of a burglary. As the State points out, in cases of rape or homicide inside a residence, a burglary of the residence also occurs. The legislature has included certain offenses for which A.R.S. § 8–238 applies. I conclude that the legislature had a rational basis for the inclusion of second degree burglary, and therefore I do not find a violation of equal protection.

## CONCLUSION

¶ 37 For these reasons, I conclude that A.R.S. § 8–238 may be constitutionally applied to the five juveniles for whom there is a judicial finding of probable cause that the juvenile has committed one of the offenses listed in § 8–238. I do not find the taking of DNA samples from these five juveniles to be an unreasonable search, a violation of privacy, or a violation of equal protection. Because Judge Orozco agrees with this result, our panel on a two to one vote denies the requested relief for the five juveniles (Mario, Bradley, Alexis, Eric, and Noble) and hereby dissolves any applicable stays preventing the taking of the DNA samples from these five juvenile petitioners.

¶ 38 For the two juveniles, Bailey and Devon, who have been arrested or accused but for whom there has been no judicial finding of probable cause to believe that the juveniles have committed the offenses for which they are charged, evaluating the totality of the circumstances leads me to the opposite result. Without the watershed event of a judicial finding of probable cause, I conclude that application of A.R.S. § 8–238 to take DNA samples from these two juveniles would be unconstitutional. Because Judge Norris agrees with this result, our panel on a two to one vote grants the requested relief to Bailey and Devon and hereby sets aside the orders requiring Bailey and Devon to submit to the taking of DNA samples under A.R.S. § 8–238.[6]

---

6. If in due course a judicial finding of probable

cause to believe that Bailey or Devon committed

OROZCO, Judge, concurring in part and dissenting in part.

¶ 39 The issue in this case is whether the State, pursuant to A.R.S. § 8–238, may extract a DNA sample from a juvenile arrestee who has been charged with a covered offense. Judge Gemmill holds that such DNA extraction is only justified after a judicial determination that probable cause supports detaining the juvenile; Judge Norris opines that in all cases the State has failed to justify such DNA extraction. I agree with Judge Gemmill that the search and seizure does not unduly burden the reduced privacy interest of a juvenile defendant subject to pretrial detention. However, I would decline to address the constitutionality of the statute as applied in the absence of a probable cause finding because the statute does not apply in such instances.

### Operation of A.R.S. § 8–238

¶ 40 In short, A.R.S. § 8–238 requires a juvenile to surrender a DNA sample upon being arrested for a covered offense and summoned to appear at an advisory hearing.[7] Covered offenses are enumerated by A.R.S. § 8–238.A; they include all forms of homicide, as well as various sexual offenses, burglary, and other offenses deemed by statute to be "serious" and "dangerous." An advisory hearing occurs "[a]fter the filing of a petition alleging delinquent or incorrigible acts." Ariz. R.P. Juv. Ct. (Rule) 28.A. Rule 28 does not require a probable cause finding in support of the charges alleged by the petition. However, Rule 23.D does require a probable cause finding in all cases of a juvenile's detention.

¶ 41 The statute prescribes that upon failure to comply with DNA testing, "the court shall revoke the juvenile's release." A.R.S. § 8–238.B. By providing only one enforcement mechanism, i.e., revocation of release from detention, the statute presupposes that the juvenile being subject to DNA testing is also subject to detention. If there is no release to revoke because the juvenile does not face detention, the statute is ineffective to compel DNA testing and is accordingly inapplicable. This presupposition that the juvenile must face detention before being subject to DNA testing is also evident in the Rules. *See* Rule 23.H (requiring the court to order DNA testing only "[u]pon petition of an arresting authority or custodial agency ... *stating that the juvenile is detained* ... and that the juvenile refused to provide a sample" (emphasis added)). Thus, only in cases where a juvenile is subject to detention does A.R.S. § 8–238 operate to compel DNA testing. Consequently, only in cases supported by a judicial determination of probable cause is the statute operable.

¶ 42 Before a juvenile can be detained, he or she is entitled to a judicial probable cause determination. If the juvenile is not being detained but refuses DNA testing, the court shall revoke the juvenile's release, in turn triggering the juvenile's right to a probable cause determination. In both cases, if no probable cause exists, the juvenile shall be released from detention as well as any obligation to submit to DNA testing. If probable cause is found, then detention and/or DNA testing are justified. Thus, there is no instance where a juvenile may be compelled to submit to DNA testing without first receiving a judicial determination that there is probable cause to detain the juvenile on the offense charged.

¶ 43 As such, A.R.S. § 8–238 only requires DNA testing for juvenile defendants charged with a covered offense for which there has been a judicial determination that probable cause supports detaining the juvenile. That is, the statute only operates when a juvenile faces charges that have been judicially determined to be supported by probable cause;

---

one of the § 8–238 offenses is made, then each juvenile for whom such a finding has been made will be in a position analogous to the five juveniles herein.

**7.** Use of the information obtained from the DNA sample as well as its preservation are governed by A.R.S. § 13–610 (2010). Subsection I limits use of the information to identification purposes,

juvenile adjudications and proceedings involving violent sex crimes. Subsections J and M provide for expunging a juvenile's DNA profile from the State's DNA identification system if the charges are not timely filed or are dismissed, if there is a trial resulting in acquittal, or if the delinquency adjudication is overturned on appeal.

the statute is inapplicable in the absence of a probable cause determination because in such cases the juvenile is not subject to detention.

### Applicability of the Fourth Amendment[8]

¶ 44 The Fourth Amendment guards against searches and seizures that are unreasonable. U.S. Const. amend. IV. The Ninth Circuit has held, "[t]here is no question that the buccal swab constitute [s] a search under the Fourth Amendment." *Friedman v. Boucher,* 580 F.3d 847, 852 (9th Cir.2009); *see Schmerber v. California,* 384 U.S. 757, 768, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) ("[C]ompelled intrusions into the body" must be deemed a search). Thus, absent a warrant, the DNA extraction requirements of A.R.S. § 8–238 will pass constitutional scrutiny only if they fall within one of the "few specifically established, 'jealously and carefully drawn' exceptions" to the warrant requirement. *State v. Fisher,* 141 Ariz. 227, 237, 686 P.2d 750, 760 (1984) (quoting *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958)). Such an exception will be granted only if the search is reasonable. *See State v. Axley,* 132 Ariz. 383, 390, 646 P.2d 268, 275 (1982) (finding an exception to the warrant requirement upon a reasonableness analysis); *see also United States v. Kincade,* 379 F.3d 813, 822 (9th Cir.2004) (cataloging the various exceptions previously endorsed by the courts).

¶ 45 Indeed, "[t]he touchstone of the Fourth Amendment is reasonableness." *United States v. Knights,* 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). A search is evaluated for reasonableness "under [the] general Fourth Amendment approach of 'examining the totality of the circumstances.'" *Id.* (quoting *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)). That is, "the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's priva-

cy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id.* at 118–19 (quoting *Wyoming v. Houghton,* 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)).

¶ 46 In this case, the State's relevant interests are on par with those previously identified by the Ninth Circuit: (1) utilizing the most accurate means of identification available; and (2) effective monitoring and supervising of detainees on conditional release. *Kincade,* 379 F.3d at 838–39. Accurate identification aids in determining whether the defendant has in the past, and consequently might in the future, further endanger society while on release, as well as ensures that the defendant will be returned to incarceration upon violation of the terms of release. *See id.*

¶ 47 The permissible uses of DNA information to serve these interests are limited by A.R.S. § 13–610.I. That is, the statute does not authorize use of DNA beyond identification or for purposes relating to the juvenile's adjudication. Thus, the State has valid interests in DNA identification of juvenile detainees and the statute's application is properly limited to serve them.[9]

¶ 48 As a predicate to evaluating the degree of intrusion on the defendant's privacy, it must first be determined to what extent the defendant has an expectation of privacy in his or her DNA. The Ninth Circuit has stated, and Arizona's case law suggests, that "conditional releasees are not entitled to the full panoply of rights and protections possessed by the general public." *Kincade,* 379 F.3d at 833; *see, e.g., State v. Kessler,* 199 Ariz. 83, 88, ¶ 20, 13 P.3d 1200, 1205 (App. 2000) ("[A] probationer is subject to restriction of his constitutional rights to a greater degree than would be permissible outside the criminal-justice system."). Similarly, juvenile detainees, for which an impartial magistrate has determined there is probable cause for detention, do not have an expectation of

---

8. I write separately on this topic to emphasize my view that the State's use of a juvenile's DNA is limited by the statute to function as no more than a genetic fingerprint and should accordingly withstand constitutional scrutiny.

9. I would note that different from this case, in *Friedman,* the State's objective was to use the defendant's DNA and the DNA databank to investigate cold cases. 580 F.3d at 858.

privacy that is commensurate with that of an ordinary citizen. Because of their status and the resulting interests of the State, such juvenile detainees have a diminished expectation of privacy, particularly concerning their identity.[10]

¶ 49 In view of this diminished expectation of privacy, my next task is to evaluate the intrusiveness of the DNA extraction, as well as the nature of the information gathered as a result of the extraction. It is well-established that the physical intrusion of DNA testing is minimal. *See, e.g., Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 625, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) ("[T]he intrusion occasioned by a blood test is not significant"). Despite the minimal invasiveness of the procedure itself, the nature of the information DNA testing reveals has the potential to be much more intrusive. However, DNA testing pursuant to A.R.S. § 8–238 is explicitly limited to particular uses, primary of which is to ascertain the juvenile's identity. A.R.S. § 13–610.I.1.

¶ 50 A juvenile whose detention has been judicially scrutinized for probable cause has no right of privacy in his or her identity. *See Kincade,* 379 F.3d at 837 ("once lawfully arrested and booked into state custody," one "can claim no right of privacy" in his or her identity). While the information DNA testing yields is more personal than taking fingerprints, given the juvenile's diminished expectation of privacy and the limitations statutorily imposed on the DNA's use, such DNA extraction is not so intrusive as to outweigh the State's countervailing interests in accurate identification and safeguarding the public from juvenile defendants released from detention.

¶ 51 It is my opinion that A.R.S. § 8–238's prescribed use of a juvenile detainee's DNA is akin to that of a fingerprint. While DNA contains vastly more information than a fingerprint, *see Kincade,* 379 F.3d at 818–19, the State is not authorized to, and there is no reason to suspect that it might, access or use this additional information in any way other

than for those purposes prescribed. *See* A.R.S. § 13–610.I. Indeed, it is the additional information contained within DNA that makes it more accurate than the fingerprint where identification is concerned, and identification is the primary purpose for which DNA is to be used.

¶ 52 Moreover, this case does not present specific facts of DNA misuse. For purposes of this case, I would simply note that there are procedural safeguards in place to prevent any misuse from occurring. That is, genetic information obtained illegally, i.e., without legislative authorization or in violation of a defendant's constitutional rights, would be barred from admissibility in court. Likewise, A.R.S. § 13–610.M provides for expunging the DNA sample in the event charges are dropped, the defendant is acquitted, or a conviction is overturned on appeal.

¶ 53 Law enforcement officers are allowed to use fingerprinting to ascertain a detainee's identity; similarly, they should be allowed to use DNA testing—a more accurate means of identification—to accomplish the same objective. This should be true regardless of the fact that there is the potential to access more information than merely the detainee's identity. That the danger of misuse exists does not mean it is significant enough to abrogate the State's legitimate interest in the most accurate identification possible.

¶ 54 Thus, given its prescribed use, the juvenile's DNA is, in practicality, a genetic fingerprint and the minimal intrusiveness imposed by the procedure is justified by balancing the State's interests against the diminished privacy interests of the juvenile. On balance, in my view, the State's interests outweigh the burden to a juvenile detainee's diminished expectation of privacy.

¶ 55 The juvenile in this case suggests DNA information might be abused and we should therefore remain suspicious of allowing its possession by the State; however, we need not place our trust in the State to

---

**10.** Though a detained juvenile has an expectation of privacy that is diminished for purposes of a totality of the circumstances analysis, I do not mean to equate the extent of its diminution with that of a juvenile who has been fully adjudicated.

My point is that when an impartial magistrate has determined there is probable cause to detain a juvenile, the juvenile's privacy expectation, particularly in his or her identity, becomes less than that of the ordinary citizen.

refrain from abusing its power, we need only trust the safeguards already in place that protect against the misuse of lawfully obtained DNA. Accordingly, I would uphold as constitutional the DNA extraction prescribed by A.R.S. § 8–238 as a reasonable search and seizure in cases supported by a judicial finding of probable cause.

NORRIS, Presiding Judge, dissenting in part, but concurring in the result as to the two juveniles.

¶ 56 The issue in this appeal is whether the State may seize a DNA sample from a juvenile arrested for an offense listed in A.R.S. § 8–238 as a condition of release without a search warrant, without a showing of probable cause to seize the sample, and before the juvenile has been convicted of any crime. The lead and concurring opinions (collectively, "majority") hold the seizures are constitutional under the Fourth Amendment. They reason that because the juveniles have been arrested and there has been a judicial finding of probable cause to believe they committed a listed offense, the juveniles have a diminished expectation of privacy that must give way to the State's interests in identifying them and ensuring the public's safety.

¶ 57 With respect, I disagree with the majority's conclusion these seizures pass constitutional muster under the Fourth Amendment.[11] These seizures are not part and parcel of "routine" booking procedures, like fingerprinting, and, consequently, of little constitutional significance. Unlike fingerprinting, DNA sampling provides the State with a storehouse of information about an individual—information the State is not entitled to seize when, as here, the juveniles have not been convicted, are entitled to the presumption of innocence, and the State has failed to justify why it is entitled to invade the reasonable expectations of privacy the juveniles have in their DNA.

¶ 58 At the time of the juveniles' advisory hearings, A.R.S. § 8–238 required a juvenile arrested for a violation of certain specified offenses to submit a "sufficient sample of buccal cells or other bodily substances" to the arresting agency for DNA testing and extraction. Although A.R.S. § 8–238 failed to identify what was to then happen to the DNA sample other than "testing and extraction," the State asserts and the majority appears to agree the sample then became subject to A.R.S. § 13–610. Under that statute, DNA samples are to be sent to the Department of Public Safety for testing, analysis, and the preparation of a DNA "profile" which DPS is to enter into the "Arizona deoxyribonucleic acid system," ("Arizona DNA Database"). See A.R.S. § 41–2418 (2011). In turn, the Arizona DNA database is linked to what is known as the "National DNA Index System," a national database that contains DNA profiles contributed by federal, state, and local forensic laboratories ("NDIS").[12] If the juvenile failed to provide

---

11. The Fourth Amendment states:

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Similarly, the Arizona Constitution, Article 2, Section 8, states "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." These constitutional provisions are central to our freedoms. Both serve the same fundamental purpose: to safeguard the privacy and security of individuals against arbitrary invasion by governmental officials. See generally Camara v. Mun. Court of City and Cnty. of San Francisco, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967) (basic purpose of Fourth Amendment is "to safeguard the privacy and security of individuals against arbi-

trary invasions by governmental officials"); State v. Baldwin, 184 Ariz. 267, 273, 908 P.2d 483, 489 (App.1995) ("Article II, § 8 not only establishes a constraint on intrusive governmental action; it also declares an element of personal freedom and autonomy that the state may legislate to protect." (citation omitted)). Or, as the United States Supreme Court has also put it: the "Fourth Amendment protects people, not places." Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967).

12. See Frequently Asked Questions (FAQs) on the CODIS Program and the National DNA Index System, www.fbi.gov/about-us/tab/codis/codis-and-ndis-fact-sheet (last visited Oct. 24, 2011). The national database is called "CODIS," which is an acronym for "Combined DNA Index System" and is the generic term used by the Federal Bureau of Investigation to describe its program for supporting DNA databases and the software for running the databases.

the DNA sample, A.R.S. § 8–238 required the juvenile court to revoke the juvenile's release status, even if no other grounds for revocation of release existed. Thus, on its face, the statute entitled the State to obtain a DNA sample as a condition of pretrial release without either a warrant or any showing of probable cause to believe the DNA sample would lead to evidence of a crime. And, through the operation of the Arizona DNA Database and its link to the NDIS, the juvenile's DNA profile, prepared from the DNA sample, would become part of a national DNA profile database accessible to local, state, and federal law enforcement agencies.

¶ 59 Under modern Fourth Amendment jurisprudence, whether a search has occurred depends on whether a person has a "reasonable" or "legitimate" expectation of privacy invaded by government action. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). This inquiry breaks down into two questions: first, whether the individual has " 'exhibited an actual (subjective) expectation of privacy,' " that is, has sought to preserve something as private; and second, whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as reasonable," that is, the individual's expectation, viewed objectively, is justifiable under the circumstances. *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967), and *id.* at 361, 88 S.Ct. at 516) (Harlan, J., concurring)).

¶ 60 The majority recognizes a buccal swab or blood draw to obtain a DNA sample constitutes a search under the Fourth Amendment. *See supra* ¶ 18 (lead opinion), ¶ 44 (concurring opinion). I agree. Indeed, under well established United States Supreme Court and Arizona case law, this is not open to question. *See generally Schmerber v. California*, 384 U.S. 757, 767–70, 86 S.Ct. 1826, 1834–35, 16 L.Ed.2d 908 (1966) (recognizing heightened privacy interests with respect to "intrusions beyond the body's surface"); *Maricopa Cnty. Juv. Action No. JV–512600 and JV–512797*, 187 Ariz. 419, 423, 930 P.2d 496, 500 (1996) (upholding state statutes that required mandatory DNA testing of juveniles adjudicated of certain delinquent offenses).

¶ 61 As the majority also recognizes, a search conducted without a judicially approved warrant is normally considered per se unreasonable under the Fourth Amendment, subject to certain exceptions, such as the one at issue here, the "totality of the circumstances test." Under that test, we must balance the degree the search intrudes upon an individual's reasonable expectation of privacy against the degree the search is needed to promote legitimate government interests. *See generally Samson v. California*, 547 U.S. 843, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). Although I agree with the majority we should analyze the seizures here under this test, the majority has misapplied the test by finding the juveniles have little if any expectation of privacy in their DNA because they have been arrested and a court has found probable cause to hold them for trial. *See supra* ¶¶ 28–30 (lead opinion), and ¶ 48 (concurring opinion).

¶ 62 The United States Supreme Court has held individuals may be searched as a condition of release under the totality test, but only after they have been convicted of a crime. *Id.* at 852, 126 S.Ct. at 2199 (upholding warrantless search of parolee); *United States v. Knights*, 534 U.S. 112, 118, 122 S.Ct. 587, 591, 151 L.Ed.2d 497 (2001) (upholding warrantless search of probationer). In so holding, the Court has explained it is the conviction that "informs both sides of [the totality test] balance." *Knights*, 534 U.S. at 119, 122 S.Ct. at 591. Discussing probation, the Court has explained: "[P]robation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty.... Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled" *Id.* (internal citations and quotation marks omitted). *See also United States v. Kincade*, 379 F.3d 813, 834 (9th Cir.2004) (upholding mandatory DNA sampling under a federal statute that requires individuals who have been convicted of certain crimes and are incarcerated or on parole, probation, or supervised release):

[The] transformative changes wrought by a lawful conviction and accompanying term

of conditional release are well-recognized by the Supreme Court, which often has noted that conditional releasees enjoy severely constricted expectations of privacy relative to the general citizenry—and that the government has a far more substantial interest in invading their privacy than it does in interfering with the liberty of law-abiding citizens.

(internal citations omitted).

¶ 63 Thus, under the totality test, it is a conviction that results in the lowered privacy interest. But here the juveniles have not been convicted of the charged offenses and have not lost the presumption of innocence or their right to demand the State prove the charges against them beyond a reasonable doubt.

¶ 64 The majority ignores the absence of any of the "transformative changes wrought by" a conviction and holds a judicial finding of probable cause that the juveniles committed the charged offenses will work in lieu of a conviction. As the lead opinion puts it, a judicial finding of probable cause is the "watershed event" that distinguishes the juveniles from mere arrestees and diminishes their reasonable expectations of privacy so that under the totality of the circumstances test the taking of the DNA samples is constitutionally permissible. *See supra* ¶ 22 (lead opinion). Thus, as the majority sees it, probable cause equals diminished privacy and the balance of interests tips in favor of the State. The lead opinion rests its conclusion that probable cause equals diminished privacy on the point that juveniles on release status are typically subjected to a number of routine restrictions and DNA sampling is no more intrusive than these restrictions, while the concurring opinion emphasizes that the taking of a DNA sample is analogous to fingerprinting and amounts to nothing more than another routine restriction on a juvenile as a condition of release. With respect, I disagree with each point. *See supra* ¶¶ 22–23 (lead opinion) and ¶¶ 51, 53–54 (concurring opinion).

¶ 65 Although a juvenile charged with an offense can properly be subjected to various routine restrictions that circumscribe or limit his or her freedom, the notion that DNA sampling is no more intrusive than these restrictions is flawed for two reasons. First, the routine restrictions identified by the lead opinion are wholly different in kind from a physical intrusion into a juvenile's body to obtain a DNA sample. To suggest they are essentially the same flies in the face of common sense and controlling legal authority, including the United States Supreme Court's decision in *Schmerber*.

¶ 66 There, police had probable cause to arrest the defendant and charge him with driving an automobile under the influence. But, those considerations by themselves did not permit the police to search him—through a blood draw—incident to his arrest. The Court stated that considerations that ordinarily permit a search of a defendant incident to an arrest

> have little applicability with respect to searches and bodily intrusions beyond the body's surface. The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.

384 U.S. at 769–70, 86 S.Ct. at 1835. *See also State v. Barnes,* 215 Ariz. 279, 280–81, ¶ 7, 159 P.3d 589, 590–91 (App.2007) (citing *Schmerber*; defendant's arrest does not obviate need for warrant to conduct search beyond the body's surface).

¶ 67 *Schmerber* and cases like it stand for a critical point: probable cause to arrest a person for a crime by itself does not diminish a person's reasonable expectation of privacy. And similarly, a judicial finding of probable cause to hold a juvenile to answer for a criminal offense does not do so either. As explained by the court in *In the Matter of the Welfare of C.T.L.,* 722 N.W.2d 484, 490–91 (Minn.Ct.App.2006):

> But, just as in *Schmerber*, where the existence of probable cause to arrest the defendant was not sufficient to permit an

intrusion into his body without a warrant, a determination of probable cause to support a criminal charge, even if it is made by a judge, is not sufficient to permit a biological specimen to be taken from the person charged without a warrant. The fact that a judge has determined that the evidence in a case brings a charge against the defendant within reasonable probability does not mean that the judge has also determined that there is a fair probability that contraband or evidence of a crime will be found in a biological specimen taken from the defendant.

¶ 68 Further, the routine restrictions identified by the lead opinion are wholly different in scope to the additional invasion of privacy that happens after the DNA sample is tested and analyzed and a profile is extracted for inclusion and use in the Arizona DNA Database and in the NDIS.

> The search in question, however, constitutes far more of an intrusion than the mere insertion of a needle into an individual's body and the consequent extraction of the blood sample. In prior cases dealing with the level of intrusion authorized by the taking of blood samples, courts did not confront a regime in which the samples were turned into profiles capable of being searched time and time again throughout the course of an individual's life. . . . The startling advance of technology has magnified the power of the initial search . . . such that the invasion of privacy is vastly more significant tha[n] we might have previously assumed.

*Kincade*, 379 F.3d at 867 (Reinhardt, J., dissenting). *See also United States v. Mitchell*, 652 F.3d 387, 407 (3d Cir.2011) (collection of DNA is first search; second search is processing of the DNA sample and creation of DNA profile for inclusion in national database); *United States v. Amerson*, 483 F.3d 73, 85 (2d Cir.2007) ("second and potentially much more serious invasion of privacy" caused by analysis and maintenance of profile information in federal DNA database); *People v. Buza*, 129 Cal.Rptr.3d 753, 760 (Cal.Ct.App.2011) (collection of DNA sample is only the first part of the search; second part occurs when the DNA sample is ana-

lyzed and profile created for use in state and federal DNA databases).

¶ 69 DNA sampling is also not analogous to fingerprinting and DNA sampling presents a level of intrusiveness not presented by fingerprinting.

¶ 70 A fingerprint is an impression "left by the depositing of oil upon contact between a surface and the fission ridges of fingers." *United States v. Mitchell*, 365 F.3d 215, 221 (3d Cir.2004). A fingerprint only identifies the person who left it. *United States v. Mitchell*, 681 F.Supp.2d 597, 608 (W.D.Pa. 2009), *rev'd* 652 F.3d 387 (3d Cir.2011). Although DNA, like fingerprinting, can be used to identify a person, that is where the comparison ends. A DNA sample contains personal information that goes far beyond a fingerprint. Unlike a fingerprint, "DNA stores and reveals massive amounts of personal, private data about that individual" and "unlike DNA, a fingerprint says nothing about the person's health, propensity for particular disease, race and gender characteristics, and perhaps even propensity for certain conduct." *Kincade*, 379 F.3d at 842 n. 3 (Gould, J., concurring).

¶ 71 Fingerprinting as a routine booking practice came before modern Fourth Amendment "reasonable expectation of privacy" jurisprudence. Police fingerprinted and obtained other identifying information, such as mug shots, from arrestees free from Fourth Amendment concerns because law enforcement needed to confirm the "true identity" of the individual. David H. Kaye, *The Constitutionality of DNA Sampling on Arrest*, 10 Cornell J.L. & Pub. Pol'y 455, 485–88 (2001). *See generally United States v. Kelly*, 55 F.2d 67, 69 (2d Cir.1932):

> Finger printing seems to be no more than an extension of methods of identification long used in dealing with persons under arrest. . . . and has become especially important in a time when increased population and vast aggregations of people in urban centers have rendered the notoriety of the individual in the community no longer a ready means of identification.

¶ 72 That today we accept fingerprinting as a routine practice without Fourth Amendment implications does not mean we must

accept DNA sampling as being the same. Practices from the 20th Century should not govern privacy expectations in the 21st Century. As noted by one court, "the fact that fingerprinting became routine without being subjected to analysis under the Fourth Amendment is no reason to use it as the basis of a conclusion that DNA testing survives that analysis." *Buza,* 129 Cal.Rptr.3d at 770.

¶ 73 Finally, the view that the DNA sampling required by A.R.S. § 8–248 is analogous to fingerprinting because it is just another, more accurate way to ascertain a juvenile's identity ignores what is really going on here. The real purpose of collecting arrestee DNA and generating a DNA profile is not to identify the arrestee in the sense of confirming his or her identity. Rather, the real purpose is to use the DNA sample and the resulting profile in the investigation of other offenses—past and future. The statutory scheme implemented by A.R.S. § 13–610—which the majority apparently believes applied to the juveniles' DNA samples—reflects this. A juvenile can request expungement of his or her DNA sample from the Arizona DNA Database if criminal charges are not filed within the required statutory period, if the charges are dismissed, or if the juvenile is acquitted at trial. *See* A.R.S. § 13–610(M). If the purpose of DNA sampling was to establish identity, there would be no need to expunge those records. After all, according to the majority, an arrestee has next to no privacy interest in his or her identity. Further, as a practical matter, DNA sampling upon arrest is not a very efficient way to establish identity. The DNA must be analyzed and a profile must be created. Yet, in fiscal year 2010, only 71% of Arizona's arrestee DNA samples were profiled. *See 2010–2012 Arizona Department of Public Safety Strategic Plan*

at 24 (available at www.azdps.gov/about/reports/docs/strategic_plan_2010_2012.pdf) (last visited Oct. 24, 2011).[13]

¶ 74 Accordingly, I disagree with the majority's conclusion the juveniles have a diminished expectation of privacy in their DNA merely because they were arrested and the juvenile court found probable cause to hold them for trial.[14]

¶ 75 That then brings me to the State's interests in obtaining the DNA samples. According to the State, its interests outweigh the privacy rights of the juveniles because it can use the DNA samples to access databases that, in turn, would help it determine, first, the juveniles' identities, and second, their involvement in past and future criminal activities.

¶ 76 As to the first point, the State has raised no issue about the identity of the juveniles, and more telling, has presented no facts it has experienced significant difficulties—or indeed any difficulties—in determining the identity of arrested juveniles without resort to these databases. Further, the State's assertion a DNA sample taken on arrest can be used to ascertain the identity of the arrestee—a point the majority accepts— is not even necessarily true, as discussed above. *See supra* ¶ 73. Further, by itself, DNA provides no identifying information; a DNA sample is only useful when it can be compared to a prior DNA sample obtained from the same person. If the arrestee's DNA is not in a DNA database, there can be no comparison and thus no verification of identity.

¶ 77 And, as to the second point, the State's interest in investigating criminal offenses rests on "the assumption [that a person arrested and accused of a crime is] more likely to commit crimes than other members of the public, without an individualized determination to that effect." *United States v.*

---

13. In comparison, the Arizona Automated Fingerprint Identification System "enables a fingerprint to be compared with millions of file prints within a matter of seconds." *See Automated Fingerprint Identification System—AFIS and Site Overview,* www.azafis.gov/about (last visited Oct. 24, 2011).

14. The majority relies on cases from other jurisdictions that have upheld mandatory DNA sampling from people who have been merely arrested and bound over for trial. *See supra* ¶ 22 (lead opinion). Those cases reach this result by comparing fingerprinting to DNA sampling and finding no meaningful distinction. As discussed above, I disagree.

*Scott,* 450 F.3d 863, 874 (9th Cir.2006). That assumption

> is contradicted by the presumption of innocence: That an individual is charged with a crime cannot, as a constitutional matter, give rise to any inference that he is more likely than any other citizen to commit a crime if he is released from custody. [Such a person] is, after all, constitutionally presumed to be innocent pending trial, and innocence can only raise an inference of innocence, not of guilt.

*Id.*

¶ 78 To be sure, I recognize there may well be situations when the State's interests will outweigh an arrestee's privacy interests to his or her DNA. *Cf. Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1984) (visual inspection of body cavities for contraband without warrant reasonable under Fourth Amendment; "detention facility is a unique place fraught with serious security danger"). But, the State has failed to make that showing here.

¶ 79 In arguing its interests outweigh the interests of the juveniles in their own DNA, the State argues, and the majority agrees, DNA sampling either through a buccal swab or blood draw is a minimally invasive procedure. But, the hard Fourth Amendment issue here is not how the State obtains the DNA sample but whether the State is entitled to have the magnitude of the personal information it reveals without a warrant.

¶ 80 Now, to be fair, several of the cases relied on by the majority point out that although DNA samples contain a vast array of personal information, the resulting DNA profiles are created from what is essentially a subset of the sample known as "non-coding" or "junk DNA" which is not generally recognized as being responsible for trait coding.

See, e.g., *Kincade,* 379 F.3d at 818.[15] According to these and other cases, because only "junk DNA" is used to create the DNA profile, no meaningful personal genetic information ends up in a DNA database, and thus, the severity of the intrusion into the privacy of the person giving the sample is minimal. *Id.* at 838 ("As currently structured and implemented ... the [federal DNA testing statute requiring] compulsory profiling of qualified federal offenders can only be described as minimally invasive—both in terms of the bodily intrusion it occasions, and the information it lawfully produces."). This reasoning, however, ignores the extent of the search that has taken place:

> [T]he Government has taken, searched, and retained rich, privacy-laden DNA in the sample. The majority's focus on the Government's *use* of that DNA as the controlling privacy consideration is simply misguided. It is akin to saying that if the Government seizes personal medical information about you but can only use a subset of that information that serves to identify you, your privacy interest in the information taken is confined to a mere interest in your identity. Nothing could be further from the truth, and the majority engages in sleight of hand by suggesting otherwise.

*Mitchell,* 652 F.3d at 424 (Rendell, J., dissenting).[16]

¶ 81 Finally, in my view, the majority's approach to the Fourth Amendment will "contribute to the downward ratchet of privacy expectations" and lead to the erosion of Fourth Amendment protections. *Scott,* 450 F.3d at 867. As Chief Judge Alex Kozinski of the Ninth Circuit Court of Appeals has written:

> Not only do [Fourth Amendment opinions] reflect today's values by giving effect to

---

**15.** Not everyone agrees junk DNA is, in fact, junk. *See, e.g.,* Simon A. Cole, *Is the "Junk" DNA Designation Bunk?,* 102 Nw. U.L. Rev. Colloquy 54 (2007); *but see* David H. Kaye, *Please, Let's Bury the Junk: The Codis Loci and the Revelation of Private Information,* 102 Nw. U.L. Rev. Colloquy 70 (2007).

**16.** The majority notes the statutory scheme set out in A.R.S. § 13–610 also imposes various restrictions that would prevent the misuse of the DNA samples. The existence of these limitations

does not solve the Fourth Amendment violation presented by the DNA sampling of the juveniles' DNA. "[W]here in our jurisprudence have we held that post-collection safeguards on the *use* of seized material can immunize an otherwise impermissible *search?* ... The majority's emphasis on *use* to define—in fact, to cabin—the nature of the interest is not supportable in law or logic." *Mitchell,* 652 F.3d at 424 (Rendell, J., dissenting).

228

people's reasonable expectations of privacy, they also shape future values by changing our experience and altering what we come to expect from our government. A highly expansive opinion [authorizing a warrantless search], one that draws no hard lines and revels in the boon that new technology will provide to law enforcement, is an engraved invitation to future expansion. And when that inevitable expansion comes, we will look to the regime we approved today as the new baseline and say, this too must be OK because it's just one small step beyond the last thing we approved.

*Kincade*, 379 F.3d at 873 (dissenting opinion).

¶ 82 For the foregoing reasons, I therefore disagree with both the lead and concurring opinions that the State's seizure of the DNA samples from the five juveniles is constitutional under the Fourth Amendment and would grant the relief they have requested. I concur in the result but not the analysis of the lead opinion as to the two juveniles and join the lead opinion in setting aside the juvenile court orders requiring them to submit DNA samples under A.R.S. § 8–238.